AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  1:17MJ-122
Apple watch Black Series 2 )
Located at the FBI Cincinnati, Ohio. )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___Southern___ District of ___Ohio___ *(identify the person or describe property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __21__ U.S.C. § __841(a)(1) & 846__, and the application is based on these facts:

See Affidavit

☒ Continued on the attached sheet.
☒ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Peter A Lakes, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/10/17

_____
*Judge's signature*

City and state: Cincinnati, Ohio            Honorable Karen L. Litkovitz, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CELLULAR DEVICE DESCRIBED AS:<br><br>Black iPhone Model A1661, FCC ID BCG-E3087A;<br><br>Apple watch Black Series 2.<br><br>**Located at the** FBI Evidence Storage Room 2012 Ronald Reagan Drive Cincinnati, Ohio 45236. | CASE NO.<br><br><br><br>**UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Peter A. Lakes, a Special Agent with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property: **a Black iPhone Model A1661, FCC ID BCG-E3087A** and **an Apple watch Black Series 2** (the Devices) which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. Your Affiant has been employed as a Special Agent of the FBI and assigned to the Cincinnati Division since August 1995. Your Affiant was temporarily assigned to the Organized Crime Section of FBI Headquarters as a Supervisory Special Agent from February 2011 through August 2012. Your Affiant's current assignment is the Ohio High Intensity Drug Trafficking Area (HIDTA) Southwestern Ohio Regional Task Force, charged with the investigation of criminal enterprises and drug law violations.

3. Your Affiant has been involved in narcotics related arrests; the execution of search warrants, which resulted in the substantial seizure of narcotics, firearms, contraband, United States currency, and other evidence of criminal activity; and supervised the activities of informants and/or confidential sources who provided information and assistance resulting in drug buys and various other criminal investigations resulting in numerous successful prosecutions. In the course of your Affiant's training and experience, your affiant has become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting narcotics investigations, your Affiant has been involved in the use of the following investigative techniques: interviewing informants and/or confidential sources and cooperating witnesses; conducting physical surveillance; conducting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized wire and oral interception electronic surveillance; and the preparation and execution of search warrants which have led to substantial seizures of narcotics, firearms, contraband, United States currency and other evidence of criminal activity. Your Affiant was the affiant in five previous court ordered interceptions of wire communications.

4. By virtue of your Affiant's training and experience, through conversations with and review of reports from other experienced agents and officers who conduct drug investigations, violent crime investigations, and gang and criminal enterprise investigations your Affiant has become familiar with the methods used by drug traffickers to import, transport, store, safeguard, remit and/or launder drug proceeds; and the methods used by drug traffickers to collect, transport, store, safeguard, remit and/or launder drug proceeds; and the methods used by drug traffickers to obtain and utilize multiple telephones, pagers, computers, and other devices in order to communicate with each other; and the jargon and/or codes commonly used when they refer to

2

drugs and/or drug proceeds. As a result of his experience, your Affiant has become familiar with the day-to-day operations and the various tools, methods, trends, paraphernalia and related articles used by various traffickers in their efforts to manufacture, possess, import, conceal, package, use and distribute controlled substances.

5. Through training and participation in investigations, your Affiant has become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms which are used to disguise conversations about their narcotics activities. From experience and training, your Affiant has learned, among other things, that narcotics traffickers rarely refer to cocaine, cocaine base (also known as crack cocaine), heroin, or other illegal drugs by name; instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms.

6. Based on the above experience and training, your Affiant is aware that persons involved in the illicit distribution of controlled substances tend to conceal their identities as well as the locations at which they reside and where drug transactions take place. Narcotics traffickers are also known to have vehicles, properties, businesses, utilities, mobile telephone service, and other assets in the names of other people to conceal association with their narcotics activity as it relates to financial transactions.

7. Your Affiant is aware through training and experience that, while narcotics traffickers may establish businesses or purchase assets in their names, narcotics traffickers also establish businesses and place assets they have acquired in the names of other individuals to conceal the true ownership; the true nature of the transactions; or the source of funds.

8. Your Affiant also knows through training and experience that narcotics traffickers will store currency, narcotics, and the records pertaining to their illegal business enterprises and to the assets they have acquired in their residences, and/or the residences of family members or

3

acquaintances who are not active participants in their drug distribution networks, or in businesses that they own or operate.

9. Your Affiant knows, through training and experience, that narcotics traffickers will also conceal and/or launder the money used in the illegal narcotics transactions through businesses they own or operate and/or by acquiring assets.

10. Your Affiant is also aware that the business of narcotics trafficking is inherently dangerous and as such, narcotics traffickers often carry firearms for their protection and for the protection of their product.

11. Your Affiant has personally participated in the investigation of, and received information regarding illegal narcotics trafficking by **PAUL CHARLES LEON** and others yet unknown.

12. The facts in this affidavit are based upon the following: personal participation in this investigation to include interviews and observation of activities reported hereinafter; physical surveillance by Affiant or by other FBI agents, Warren County Drug Task Force Officers, and Ohio Highway Patrol Troopers and reported to Affiant directly or indirectly; oral and written reports regarding this and other investigations, which Affiant has received directly or indirectly from Warren County Drug Task Force Officers, and Ohio Highway Patrol Troopers, as well as statements of other witnesses and concerned parties; review of public records, checks of criminal history through databases accessible to law enforcement; telephone records related to subscriber information and toll information; telephone pen register records; and debriefing of confidential informants and confidential sources by Affiant or reported to Affiant, either directly or indirectly.

13. Since this affidavit is being submitted for the limited purpose of seeking authorization for the search of the Devices, your Affiant has not set forth each and every fact learned during the course of this investigation.

4

14. On the basis of this familiarity, Affiant alleges that facts contained in this affidavit show probable cause that **PAUL CHARLES LEON** and others yet unknown have committed, are committing, and will continue to commit the following criminal offenses:

   a. Distribution of, and possession with intent to distribute, controlled substance, including heroin and cocaine in violation of Title 21 United States Code, Section 841(a);

   b. Use of a communications facility to facilitate narcotics trafficking activities, in violation of Title 21, United States Code, Section 843(b);

   c. Conspiracy to distribute, to possess with intent to distribute, controlled substance, in violation of 21, United States Code, Section 846;

   d. Laundering of monetary instruments, in violation of Title 18, United States Code, Section 1956; and

   e. Engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

15. Further, it is believed the facts contained in this affidavit show probable cause that firearms-related offenses as stated in violation of 18, United States Code, Section 922 and 924 have been committed.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

16. The property to be searched: **a Black iPhone Model A1661, FCC ID BCG-E3087A** and an **Apple watch Black Series 2**, referred hereinafter to as the "Devices.". The Devices were found during the arrest of **PAUL CHARLES LEON** and/or during the search of his residence pursuant to a search warrant on February 9, 2017. The Devices are currently located at the FBI Evidence Storage Room, 2012 Ronald Reagan Dr., Cincinnati, Ohio 45236.

17. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

5

## PROBABLE CAUSE

18. The Cincinnati FBI started an investigation after the Warren County Drug Task Force executed a warrant at 808 Birch Grove, Morrow, Ohio, the residence of an upper level Heroin trafficker, on January 31, 2017.

19. On January 31, 2017, the Warren County Drug Task Force executed a search warrant at 808 Birch Grove, Morrow, Ohio. The search warrant was obtained for the residence of an upper level Heroin trafficker. After executing the search warrant, a cooperating witness (hereinafter referred to CW1), was interviewed and asked about his/her drug trafficking activities. CW1 advised that his/her source of supply was a Mexican who goes by "CARLOS". CW1 advised that he/she believes that his real name is not "CARLOS". CW1 also advised officers that the phone number he/she utilizes to contact "CARLOS" is 513-815-0029. CW1 stated that he/she regularly purchases 1 Kilogram of Heroin from "CARLOS" for $75,000 and that CW1 also purchases from "CARLOS" a half Kilogram of Cocaine for $17,500. CW1 advised that he/she usually purchases 1 Kilogram of Heroin and a half Kilogram of Cocaine approximately every two weeks from "CARLOS". CW1 stated that he/she meets "CARLOS" in the parking lot of the Mexican restaurant "El Jinete" off Montgomery Rd, within the Southern District of Ohio. CW1 advised that "CARLOS" indicated he would be going out of town to pick up Heroin and Cocaine which he would transport back into the Southern District of Ohio. However, CW1 was not aware of when "CARLOS" left town, if at all. CW1 stated that "CARLOS" was expected to return to the Cincinnati area no later than February 4, 2017. CW1 stated that "CARLOS" drives a white Jeep Liberty and that when he/she met "CARLOS" to pick up a Kilogram of Heroin, he/she saw at least four Kilograms of Heroin in the vehicle.

20. CW1 placed a controlled call to "CARLOS" utilizing 513-815-0029. "CARLOS" answered and CW1 asked where he was. "CARLOS" advised that he was still out of town and wanted to know why CW1 was calling. CW1 advised he/she was wanting to know if "CARLOS"

6

was going to be bringing back "what we talked about," meaning Heroin and Cocaine. "CARLOS" advised that he would be back this weekend and it would be Sunday at the latest. This phone call was recorded. The actual location of where "CARLOS" was at the time CW1 placed the controlled call was unknown to law enforcement when the call was placed. Based on the travel patterns of "CARLOS", he travels frequently between the Southern District of Ohio and other jurisdictions for the purpose of engaging in narcotics trafficking.

21. On February 2, 2017, United States Magistrate Judge Karen L. Litkovitz authorized a warrant to determine the location of 513-815-0029 for a period of 30 days. Agents served the warrant, which returned no information.

22. On February 7, 2017, CW1 called Agents to advise them that he/she was in contact with his/her partner and had obtained a new phone number for "CARLOS." CW1 provided 650-461-0683 as the new phone number. This information was verified through a recorded jail phone call which occurred on February 4, 2017. Based on additional information heard over jail calls, it is believed that "CARLOS" is currently located within the Southern District of Ohio.

23. On February 8, 2017, United States Magistrate Judge Karen L. Litkovitz authorized a warrant to determine the location of 650-461-0683 for a period of 30 days. Agents began receiving information from T-Mobile on February 9, 2017.

24. On or about February 8, 2017, law enforcement had CW1 place another controlled call to "CARLOS" on 650-461-0683. This call was monitored and recorded by law enforcement. In this call, CW1 and "CARLOS" discussed an outstanding drug debt owed to "CARLOS" by CW1 in the amount of $45,000. Also in this call was a discussion about prior dealings, including CW1's sale of a firearm to "CARLOS" which "CARLOS" advised is now "in Mexico." "CARLOS" also discussed with CW1 the sale of 461 grams of heroin and 6 ounces of cocaine to CW1's partner, referenced above. Finally, "CARLOS" advised his suppliers, in Mexico, were aware of the location of the family of "CARLOS", and "CARLOS" was scared because of the

7

monies he owed the source of supply but was not able to pay because CW1 had not paid "CARLOS" for the drugs previously supplied.

25. On or about February 8, 2017, law enforcement directed CW1 to send an SMS Message to 650-461-0683. The phone used to send this message is controlled by law enforcement and law enforcement was monitoring CW1 as s/he sent the following SMS Message:

*OK homie but I got my power lick waiting homie and I have yo cheese.*

26. Your Affiant, based on his training, knowledge and experience believes this message is CW1 advising he has a customer waiting for drugs that are to be supplied by "CARLOS" (power lick) and CW1 has money for "CARLOS" (Cheese).

27. On or about February 9, 2017, law enforcement received an SMS Message from 650-461-0683 on the phone "CARLOS" believed to be the phone used by CW1, but in fact was in the possession of an FBI Task Force Officer. The SMS Message read as follows:

*hey man I need to get that today 4 diz ppl.*

To which the FBI TFO, using the phone believed by "CARLOS" to be used by CW1, replied as follows:

*Homie, im ready meet at viva tequlla in kings mills right of 71 im about to be there to eat.*

To which "CARLOS" replied,

*I need almost two hours im driving back to yhe (sic) city*

28. Based upon the information provided by T-Mobile pursuant to the warrant for 650-461-0683, law enforcement was able to track the phone and subsequently located a white Jeep Liberty at the same location as the data from T-Mobile indicated the phone assigned number 650-461-0683. The plate on this Jeep, Ohio GYL4597, is registered to **4023 Leesburg Lane, Apt 17, Cincinnati, Ohio 45209** which is the known address of **PAUL CHARLES LEON**. Your Affiant knows, based on his training, knowledge and experience, "CARLOS" is the Spanish name for CHARLES (Middle Name of **PAUL CHARLES LEON**).

8

29. Warren County Drug Task Force Officers caused a search of OHLEG to be conducted for **PAUL CHARLES LEON** and learned that the address to which the Jeep Liberty is registered is **4023 Leesburg Lane, Apt 17, Cincinnati, Ohio 45209 (Target Location)**. The information obtained further established that the vehicle had been registered to the **Target Location** since April of 2016. Additionally, officers searched open source information available regarding the residency of LEON and found that he has been residing at the **Target Location** since May of 2016.

30. Information also obtained from the Ohio Law Enforcement Gateway (OHLEG) database revealed a second vehicle registered to **LEON**. This vehicle, a 2006 Hummer, assigned Ohio vanity plate NAYARIT has also registered to **4023 Leesburg Lane, Apt 17, Cincinnati, Ohio (Target Location).**

31. On February 9, 2017, TFO Brandon Lacy conducted surveillance on the residence known as **4023 Leesburg Lane, Apt 17, Cincinnati, Ohio 45209 (Target Location).** TFO Lacy observed the Hummer bearing Ohio vanity plate NAYARIT.

32. Based upon the text indicating LEON would be driving to Vive Tequila, Ohio Highway Patrol Troopers established surveillance on Interstate 71. After surveillance was established, OHP Troopers observed **LEON** driving the Jeep Liberty and observed the vehicle did not have a front license plate, which is a violation of Ohio law. Based upon this observation, OHP conducted a traffic stop on the Jeep Liberty being driven by **LEON**.

33. OHP Troopers noticed the panels on the interior door of the Jeep Liberty appear to have been removed and replaced, which is consistent with vehicles which are used by narcotics traffickers to transport illegal narcotics.

34. Based upon this observation, **LEON** was transported to the Highway Patrol Post 83, in Lebanon, Ohio. **LEON** was searched prior to transport and found to have approximately $2,800 in United States Currency on his person. During the interview, **LEON** confirmed he resided

9

at **4023 Leesburg Lane, Apt 17, Cincinnati, Ohio (Target Location)**, and had been living at the residence for approximately one year. Finally, officers requested the assistance of a canine unit. The canine positively alerted on the Jeep Liberty being driving by **LEON** for the presence of narcotics.

35. The Devices were found during the arrest of **LEON** and/or during the search of his residence pursuant to a search warrant on February 9, 2017. Agents believe, based on the above, that the Devices were used in facilitating the illegal narcotics transactions referenced above.

36. The Devices are currently located at the FBI Evidence Storage Room, 2012 Ronald Reagan Dr., Cincinnati, Ohio 45236. They came into the FBI's possession following the arrest of **PAUL CHARLES LEON** and/or during the search of his residence pursuant to a search warrant on February 9, 2017.

37. The Devices are currently in storage at FBI Evidence Storage Room, 2012 Ronald Reagan Dr., Cincinnati, Ohio 45236. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the FBI.

## TECHNICAL TERMS

38. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from

the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

11

    d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same state.

39. Based on my training, experience, and research, I know that these type of Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, and a GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### APPLE ID

40. As described in Attachment A, the Devices are Apple brand devices, specifically **a Black iPhone Model A1661, FCC ID BCG-E3087A**, and **Apple watch Black Series 2** (the Devices).

41. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

42. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

13

43. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

44. The passcode or password that would unlock the Devices is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the Devices to the Device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

45. Your Affiant has personally participated in the investigation of, and received information regarding illegal narcotics trafficking by **PAUL CHARLES LEON** and other criminal offenses in violation of 21 U.S.C. § 841(a)(1); 21 U.S.C. § 846; 21 U.S.C. § 843(b); 18 U.S.C. §§ 1956 and 1957; and 18 U.S.C. §§ 922 and 924. The Devices came into the possession of the FBI during the arrest of **PAUL CHARLES LEON** and/or the search of his residence on February 9, 2017. Based on these facts and my training and experience, it is likely that **PAUL CHARLES LEON** is the user of the Devices and thus that his fingerprints are among those that are able to unlock the Devices via Touch ID.

46. Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Devices as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

47. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of **PAUL CHARLES LEON** to the Touch ID sensor of the Devices for the purpose of attempting to unlock the Devices via Touch ID in order to search the contents as authorized by this warrant.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

49. *Nature of* examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of these Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

50. *Manner of* execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

15

## CONCLUSION

51. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

52. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Peter A. Lakes
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 10 day of February, 2017

HONORABLE KAREN L. LITKOVITZ
UNITED STATES MAGISTRATE JUDGE